Statement of the Case.
MONROE, C. J.
Plaintiff has appealed from a judgment rejecting his claim for damages said to have been sustained by him in the death of his minor son, through the alleged fault of the defendant.
The minor, accompanied by his mother, was paying a visit to the boy’s grandfather, Miles T. Smith, at or near Jena, and Smith concluded to go upon a fishing expedition to a creek some eight or nine miles distant, taking with him his son, Gerald, aged about 16, and the minor, Clifford, who was in his eleventh year, and, as defendant’s logging road extended in the direction of the creek, to find transportation for the party upon one of its trains. Defendant, however, operated but three trains, two of them consisting each of a “Shay” (cogwheel) engine, and log cars which are mere skeletons, and the other, of a rod engine (inferior in power to the others) with a tender and a single flat car for the carriage of tools and material to be used in repairing the road. Neither of the trains was equipped for the carriage of passengers. The manager of the business (saw-mill and logging road) had instructed the subordinate employes that none were to be carried without his permission, and had given public notice to that effect by means of placards attached to the engines and cars, reading:
“Warning.
“All persons are hereby warned and prohibited from riding on the engine or any of the logging cars unless by permit of management.
“White Sulphur Co., Ltd.”
And the subordinates had given it generally to be understood that they were without authority to allow persons not in the employ of the defendant to ride on its trains without “permits” from the management. The subordinates did not, however, in all cases, if in any, undertake to enforce the prohibition, the difficulty, and frequently personal danger of doing which is well understood by all railroad operatives; and outsiders traveled on defendant’s trains very much as they pleased, though, at times, perhaps, surreptitiously, as we infer from the testimony of one of the plaintiff’s witnesses, who, at the time of the accident here in question, happened to be serving a jail sentence for “bootlegging whisky,” and who, being asked, “Whose permission did you usually ask to ride on the train?” replied, “I never did ask any one; I just crawled on; I have seen as high as eight or ten on at a time.” Mr. Smith testifies that Mr. Cooper, the then manager of defendant’s business, but who was killed on November 9, 1913 (over seven months prior to the accident), had given him permission to ride on defendant’s trains whenever he pleased, from which it may reasonably be inferred that he knew that such permission was required, though he testifies that he “never heard any one say that it was against the rules” to ride without such permission and he admits that he had obtained no such permission on the occasion of the accident from Adams, who succeedeu Cooper. He says that, upon that occasion, he obtained *887 permission from York, wlio was the engineer of the train upon which the accident occurred, but he denies that York warned him, in giving him the permission, that it was dangerous to ride on the train. York, on the other hand, testifies, in part, as follows:
“Yes, sir; the morning he went out on the train, he came by my house and told me that lie wanted to go out fishing with me on the train. I told him that it was dangerous to go, but that people were riding all the time, (and) as far as I was concerned he could go. * * * Q. Mr. Smith didn’t bring you a permit of any kind from any one in authority, did he? A. No, sir. Q. In other words, from what you told him, you let him know that he would have to bring you a permit from this manager? A. Yes, sir; I usually always tell them that I have no authority to put any one off, but that I had no authority to let him ride.”
It nowhere appears from the testimony that Mr. Smith informed Mr. York that he expected to take with him two boys, the one 16 and the other, say, 11 years of age, though it may be that such intention was to have been inferred. On the morning to which York refers (June 17, 1914) a loaded log train (No. 2) started from the woods in the direction of the mill, and the repair train (No. 1), consisting of an engine, tender, and one flat car, and a train (No. 3), consisting of an engine and 17 empty log cars (which the engine was pushing) started from the mill towards the woods. The two trains last mentioned were under the control of Salmon, defendant’s woods foreman, who rode on the fiat car of train No. 1 and signaled to the engineer of No. 3 to follow him, which the engineer did. Smith and the boys were also on the flat car. After passing about 200 yards beyond “Wilson’s,” a place where there was a siding by means of which trains moving in opposite directions could pass each other, Salmon discovered No. 2 approaching from his front, and had train No. 1 (on which he was riding) stopped, and turned back in order to avoid the threatened collision. He, himself, jumping off and going a short distance forward in order to signal train No. 2, which was appearing around a curve in the road. There are two witnesses who testify that, about the time of, or shortly before, the trial, Smith, in the course of a conversation, said that if he had followed Salmon’s advice, given at that moment, to get off the train too, the accident might not have happened, meaning, of course, if he had taken the boys with him, and that testimony is, to some extent, corroborated, by the testimony of Gerald Smith to the effect that Salmon said something to his father, but that he did not understand what it was. However that may be, train No. 1, in backing to avoid train No. 2, soon found itself threatened with a collision by train No. 3, which was approaching from the other direction. York, the engineer, therefore, stopped No. 1 again, and, again reversing, moved toward the still approaching No. 2, and when the collision with that train became imminent, again stopped, reversed, and moved towards No. 3, which was also still approaching; and as those two trains (by that time, barely moving) were about to come together, and the engine of No. 2 about to run into the engine of No'. 1, Smith jumped off the flat car, and, having done so, called to the boys, “Jump, boys, jump” and Gerald jumped, almost immediately, after which the engine of No. 2, moving at the rate of about six miles an hour, ran into the engine of No. 1, creating a jar which practically derailed the tender of that engine and two of the “empties” in train No. 3, and, presumably jolted the little boy, Clifford, off the flat car, he being found crushed under the engine of train No. 1, which appears to have moved back about 16 feet after the collision. Smith and his son, Gerald, were somewhat bruised in jumping (Gerald says that he hurt his knee), but not seriously, and the engine and cars were damaged to the extent of about $50. It appears to us that the accident was the result of gross carelessness on the part of Salmon, who was in *889 authority in the matter of handling the trains, and he seems to have felt that he was to blame, since, though summoned as a witness by both litigants, he made no appearance on the trial. On the other hand, we find no sufficient reason for doubting that Smith knew that it was a violation of defendant’s rules for persons, not connected with its business, to ride on its trains without express permission from its manager. He also knew that the manager, from whom he says that he had obtained such permission for himself, but not for children, had been dead for more than seven months, and had been succeeded by another manager, from whom he does not pretend to have obtained permission.
Opinion.
If defendant should be held liable upon the facts as wé have found them in this case, it would follow that it would be equally liable for all the personal injury and death that might result, should one of its locomotive engineers take his family, or the teachers and children of a school, after those sufficiently intelligent to appreciate it had been warned of the danger, and that he was without authority so to do, upon an excursion on a log train, and equally would the owner of any other vehicle, or any animal, not intended for such use, be liable to those who, without his knowledge or consent, and in disregard of Ms expressed will, should sustain injury or damage by using such vehicle or animal as a means of personal transportation, through collusion with, of the acquiescence of, an unauthorized agent. But such is not the law. The minor, whose life was so deplorably sacrificed, was placed by his parents under the care, for the time, being, of his grandfather, a matter for which this defendant was in no wise responsible. The grandfather placed him upon defendant’s work train without defendant’s knowledge or consent, with the bare acquiescence of the engineer, who was without authority to consent thereto, and in disregard to the company’s published rules, though it was known to the grandfather that such permission could be granted only by its manager, an act for which defendant was no more responsible than for that of the parents in intrusting the child to the care of the grandfather. Whatever, therefore, may be the responsibility, moral or legal, of the agent of -the parents, authorized to use sound discretion, and the agent of the defendant, vested with no such authority, such responsibility does not rest upon the defendant. Abundant authority in support of the doctrine thus stated may be found in the note to the case of St. Louis, I. M. & S. R. Co. v. Jones, 96 Ark. 558, 132 S. W. 636, 37 L. R. A. (N. S.) 419. See, also, Holmes v. Cromwell & Spencer Lumber Co., 51 La. Ann. 352, 25 South. 265; Johnson v. La. Railway & Nav. Co., 129 La. 332, 56 South. 301, 36 L. R. A. (N. S.) 887; Tommie v. Little River Lumber Co., 136 La. 651, 67 South. 539.
Judgment affirmed.